WOOD, Chief Judge.
Jeffrey Rothbard pleaded guilty to one count of wire fraud in connection with his participation in a scheme to defraud com *700 panies that were interested in obtaining loans for environmentally friendly upgrades to their facilities. He committed this offense, which yielded more than $200,000 for him, while he was on probation for a felony forgery conviction in Indiana. The district court sentenced him to 24 months’ imprisonment, despite the fact that Rothbard is an older man with serious health problems and the Probation Office thought that incarceration was not necessary. On appeal, Rothbard urges us to find that his sentence is substantively unreasonable, both because he has stayed out of trouble for nearly three years and because he fears that the Bureau of Prisons (BOP) may be unable to furnish the medication on which his health critically depends.
Perhaps, had we been the sentencing judges, we would have accepted his arguments. But the district court here gave sound reasons for its chosen sentence. In addition, both the evidence in the record before the district court, and supplemental information that we requested about BOP’s ability to provide appropriate care, satisfy us that the nominal 24-month sentence will not, in reality, spell doom for Rothbard. We therefore affirm the district court’s judgment.
I
Rothbard’s offenses date back to at least 2010, when he installed some check designer programs on an office computer and used them to forge two checks, amounting to $7,700, to his wife. He was convicted in state court for that offense and placed on probation. While on probation, he launched the scheme that underlies his present conviction. When all was said and done, he had defrauded 17 victims of $211,658.53, acting as the registered agent of “GreenCity Finance.” The scheme was relatively simple: GreenCity would purport to arrange for financing for energy savings upgrades, but it would require a deposit to process the loan. The clients paid the deposits, but the money went straight to Rothbard’s pocket. He used it on personal items, including to attend a PGA golf tournament and to buy his son a vehicle. Ultimately he was caught and charged with wire fraud in violation of 18 U.S.C. § 1343; he waived indictment and pleaded guilty. His appeal pertains exclusively to his sentence.
II
The key fact behind Rothbard’s sentencing challenge relates to his health. In 2005, well before the time he instituted the GreenCity scheme, he was diagnosed with imatinib-resistant chronic myeloid leukemia — -a particularly virulent form of that cancer. His doctor, Larry Cripe, prescribed the drug nilotinib, which is one of three possible drugs recognized for the treatment of Rothbard’s type of leukemia. All three are extremely expensive: the Journal of Clinical Oncology reported in 2013 that the annual price of nilotinib is $115,000 to $124,000; the price of the other two drugs, dasatinib and ponatinib, appears to be comparable. Hagop M. Kantarjian et al., Cancer Drugs in the United States: Justum Pretium—The Just Price, 31 J. Clinical Oncology 3600, 3601 (2013).
Before sentencing, the Probation office prepared its usual Presentence Investigation Report (PSR), in which it calculated an adjusted offense level of 16 and a criminal history of II, which translates into a range of 24 to 30 months’ imprisonment. Because of Rothbard’s health, however, Probation recommended a more lenient sentence: 12 months’ detention at a halfway house and another 12 months’ home confinement, in lieu of prison. It suggested that this would offer adequate deterrence and would assure that Rothbard’s medical *701 needs were properly met. Probation then revised the recommendation to three years’ probation, noting that although Rothbard seemed to need a harsher penalty to deter future criminal behavior (because he had committed the fraud while on probation), it seemed unfair to burden the taxpayers with the exorbitant cost of Roth-bard’s medication in prison.
Rothbard filed a pre-sentencing memorandum in which he urged that a custodial sentence would be unreasonable, because (he asserted) BOP could not guarantee that he would receive the medical care he needed in one of its facilities. The reason for the lack of a guarantee relates to the way in which BOP manages prescription drugs. It maintains a formulary of drugs that its physicians are permitted to prescribe without further0 ado. That does not mean, however, that non-formulary drugs are impossible to obtain. To the contrary, if a doctor believes that a patient needs a non-formulary drug, the doctor may prescribe it by following certain procedures.
Based primarily on the nature of Roth-bard’s crime and the fact that he committed it while on probation, the district court rejected Probation’s recommendations and imposed a Guidelines sentence of 24 months in the custody of BOP, followed by two years’ supervised release. In so doing, it did not ignore Rothbard’s medical situation. It took into account a letter that the government had obtained from Dr. Paul Harvey, the Regional Medical Director for BOP’s North Central Region. Dr. Harvey reviewed Rothbard’s records and a letter from Dr. Cripe, and offered these comments:
CARE Level 4 inmates require services available at a Medical Referral Center (MRC) and may require daily nursing care. The MRC facilities have clinical staff available in-house, 24-hours per day, and have contracts with community specialists for additional review' and/or care, if clinically necessary. The BOP has six Medical Referral Centers [including] Butner, North Carolina.
Rothbard was later designated to Butner, although it appears that he will need a re-designation after this appeal is resolved.
Dr. Harvey’s answer to the question whether Rothbard would be able to continue with his successful course of nilotinib was a qualified “yes.” He conceded that nilotinib is not on the National Drug For-mulary, but he said that BOP permits a medical provider to “submit a non-Formu-lary request and prescribe the requested medication pending approval of the request.” He also noted that an expedited approval process exists, and when it is used, a decision on the request is generally made within 24 hours. (The need for such approval is the reason we describe the “yes” as qualified.) Finally, Dr. Harvey said that nilotinib had been “approved for inmates with medical conditions similar to Mr. Rothbard’s.”
The district court considered Rothbard’s leukemia as it considered what sentence to impose, but it was unpersuaded that Roth-bard’s medical condition justified a noncustodial sentence. It relied on Dr. Harvey’s representation that BOP could provide whatever care was necessary. Turning to the other side of the balance, it noted several facts that pointed toward a sentence including imprisonment. Calling Rothbard’s scheme a “crime of pure greed,” the court referred to the need to protect the public and the fact that Roth-bard had brazenly committed this crime while on probation for the forgery offense. The judge commented that the crime was sufficiently troublesome, in his view, that he “never really seriously considered probation.” Instead, he opted to accommodate Rothbard’s medical needs by “pointing] out to the Bureau of Prisons that the *702 defendant does have leukemia that’s in remission by medication and request[ing] that the Bureau of Prisons take special note of that medication and make sure that he receives that medication for treatment of that condition so that it remains in remission.”
Because of the grave nature of his medical condition and the risk that a deprivation of nilotinib might cause a serious recurrence of his disease, Rothbard moved for a stay of his report date pending his appeal in this court. The district court denied the stay, but this court granted it and expedited the appeal. In addition, because we were unsure how effectively the procedures described by Dr. Harvey operate, we ordered the parties to provide additional information about what Roth-bard might expect if he were to go to a BOP facility. It is unusual, we concede, to supplement the record on appeal on such a critical point, but the stakes are high, and so we thought this step was justified.
When a new inmate shows up at BOP, the inmate goes through a comprehensive medication review as part of his intake screening. For purposes of continuity of care, the government represents, BOP policy allows for the continuation of most medications — including non-formulary drugs — for a period of time pending review and approval of anything that is not on the Formulary. Rothbard appears to agree with that, in part. He presents an updated affidavit from Philip Wise, the former Assistant Director of BOP with responsibility for health care. (This too is new on appeal; we grant Rothbard’s February 8, 2017, motion to supplement the record with Wise’s Declaration.) Wise states that non-formulary drugs may be continued for four days upon arrival. After that, according to Wise, there are no guarantees. Relying on this, Rothbard argues that this means for him that there is no assurance that he will be able to continue with his nilotinib after the four-day period expires. The government responds that Wise himself concedes that BOP has the ability to process urgent requests within hours, if medically necessary. It also reports that there have been ten requests for' nilotinib since 2010, and all ten requests have been approved for the same condition as Rothbard has.
We were also interested in the qualifications of the people who are responsible for these approvals. The government informs us that approval authority resides with a Central Office Physician, and that the final decision over non-formulary drug requests is made by either a pharmacist or a physician. Wise wrote that when he was in charge, denials were based on one of two possible reasons: either the requested drug was not medically necessary, or that there was a therapeutic equivalent medication available on the formulary. In this case, the government does not argue that either of those reasons would apply.
One might worry that BOP would have an incentive to be sparing with its orders for particularly expensive non-formulary drugs, such as nilotinib. There is no evidence, however, that it has done so, and in Rothbard’s case, there is less reason to fear' a secret economic motive. Rothbard’s health care is already being billed to the public, because he is using government-provided health insurance. More importantly, the record shows that BOP has ordered nilotinib itself on ten other occasions, evidently in recognition of the fact that it might be essential (as it apparently is for Rothbard). Indeed, the high price of nilotinib suggests that it has no adequate substitutes: whether it is being used for prisoners or the public at large, a drug that faces several therapeutic alternatives in the market will not command as high a price.
*703 In the final analysis, this ease boils down to the fact that BOP is not willing or able to pre-commit to. nilotinib for Roth-bard, before he has gone through the intake examination at the prison medical center. Although it might be sensible in cases such as this one for BOP to have some way of examining people before they report, that is not its practice and we are not persuaded that the lack of a pre-report examination is independently actionable. In addition, we cannot find fault with BOP’s reservation of the right to conduct its own medical examination. While Roth-bard’s case might be an easy one, there will be other entering inmates who are subjectively convinced that they need one particular medication, but for whom an alternative or more conservative treatment may be medically acceptable. BOP would be'acting irresponsibly if it did not make an independent decision, based on a thorough and professional examination of thé new inmate and his medical history.
Ill
We conclude that this is not a case in which the only substantively reasonable sentence would have been one that kept Rothbard out of prison. The district court was faced with evidence supporting a noncustodial punishment — Rothbard’s trouble-free record for the last several years, and the assurance of continuity of his successful treatment at the hands of Dr. Cripe— as well as evidence supporting some time in prison — the nature of his crime, the fact that he committed it while on probation, and the factual finding that BOP would be able to serve his medical needs. We find no clear error in any of those findings of fact. And with this much established, we have no reason to find Rothbard’s sentence of 24 months (which fell within the recommended Guidelines range) substantively unreasonable.
We close, however, with a caveat. If Rothbard shows up at a BOP facility and discovers that the responsible people are dragging their feet in a way that deprives him for any significant time of his nilotinib, or if the BOP evaluator (contrary to all of the evidence we have seen) takes the position that a medically suitable alternative from the formulary exists, Rothbard is free to use the BOP’s grievance procedures to complain about any such problem. On that understanding, we Affirm the judgment of the district court.